IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

NATHANIEL MORGAN,                    *
                                     *
     Plaintiff,                      *
                                     *
vs.                                  *     CIVIL ACTION NO. 12-00204-B
                                     *
CAROLYN W. COLVIN,[1],               *
Commissioner of Social Security,*
                                     *
     Defendant.                      *

## ORDER

Plaintiff Nathaniel Morgan (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. On May 30, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 18). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Upon careful consideration of the administrative record and the memoranda of the parties, it is

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

hereby **ORDERED** that the decision of the Commissioner be **REVERSED** and **REMANDED**.

## I.   Procedural History

Plaintiff filed an application for disability insurance benefits on January 8, 2009, and alleged that his disability commenced on October 15, 2008. (Tr. 226-30). Plaintiff's application was denied on January 21, 2009 (id. at 52-57), and he timely filed a Request for Hearing on January 30, 2009. (Id. at 60-61). On July 8, 2010, Plaintiff and his attorney attended an administrative hearing, which was held before Administrative Law Judge Vincent P. Intoccia (hereinafter "ALJ"). (Id. at 24-50). A vocational expert ("VE") also appeared at the hearing and provided testimony. (Id. at 44-50). On September 7, 2010, the ALJ issued an unfavorable opinion finding that Plaintiff is not disabled. (Id. at 10-20). The Appeals Council denied Plaintiff's request for review on January 26, 2012; thus, the ALJ's decision dated September 7, 2010 became the final decision of the Commissioner. (Id. at 1-6). Having exhausted his administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issues on Appeal

A. **Whether the ALJ erred in finding that Plaintiff's glaucoma and hypertension, singularly and in combination, were non-disabling?**

B. **Whether the ALJ erred by not performing a "function by function" analysis of Plaintiff's limitations in violation of Social Security Ruling 96-8p?**

C. **Whether the ALJ erred in finding that Plaintiff can perform the representative jobs outlined by the vocational expert (VE) because their descriptions in the Dictionary of Occupational Titles (DOT) are at odds with Plaintiff's residual functional capacity ("RFC")?**

III. **Factual Background**

Plaintiff was born on April 22, 1963, and was 47 years of age at the time of his administrative hearing. (Tr. 27, 134). Plaintiff earned a high school diploma and subsequent thereto, studied welding at Wallace Community College. (Id. at 27). Plaintiff has past work experience as a candy maker in a warehouse, as a production manager at a cigar plant, and as a yard worker. (Id. at 29, 134, 170). According to Plaintiff, his last job ended when the cigar plant closed on October 15, 2008, at which time he began collecting unemployment. Plaintiff testified that he did not seek work after the plant closed, and that his disability commenced on the day after the plant closed. (Id. at 29, 134, 170).

Plaintiff contends that he cannot work because he is unable to see. (Id. at 33). According to Plaintiff, he has glaucoma, which makes it difficult for him to see, and although he has a

driver's license, it has a glasses restriction, and he has not driven a car in six to eight years. (Id. at 30-34).  Plaintiff asserts that he is blind in his left eye and has no peripheral vision in his right eye. (Id. at 37).

IV.  **Analysis**

    A.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[2] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Id.; Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").  In determining whether substantial

---

    [2] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B.   Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[3] 20 C.F.R. §§ 404.1520, 416.920.

---

[3] The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden,

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since October 15, 2008, and that he has the severe impairments of obesity, hypertension, glaucoma, status post bilateral laser surgery associated with Plaintiff's 2006 surgery, and status post laser right eye surgery associated with his 2010 surgery. (Tr. 12). The ALJ also found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a range of light work. (Id. at 13). The ALJ specifically found that Plaintiff can sit, stand, and walk for six hours each in an eight-hour workday, that he can lift up to twenty pounds

---

the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

occasionally and ten pounds frequently, that he can occasionally climb ramps and stairs, kneel, crouch, crawl, and stoop and that he has no limitations with regard to pushing and pulling, including operating hand and foot controls. (Id.).  The ALJ also concluded that Plaintiff cannot work around dangerous heights or machinery and that he cannot climb ladders, ropes, or scaffolds. (Id.).  He further concluded that Plaintiff has limited near acuity, far acuity, depth perception, and field of vision, and that he has normal accommodation and color vision. (Id.).

The ALJ then determined that Plaintiff is unable to perform his past relevant work and concluded, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, that he can perform "the requirements of representative occupations such as a product assembler . . .[a] laundry worker . . .and [an] assembler electronic access." (Id. at 19).  Thus, the ALJ concluded that Plaintiff is not disabled. (Id. at 19-20).

### 1. Medical Evidence

The relevant medical evidence of record reflects that as early as August 2005, Plaintiff sought treatment at the Song Eye Center for problems with his eyesight. (Id. at 203).  In 2005, Plaintiff's eyesight, with best correction, was measured at

20/20 in the right eye and 20/count finger in the left eye.[4]
(Id. at 203).   Plaintiff was diagnosed with primary open angle
glaucoma of the left eye with decreased corrected visual acuity
and prescribed Xalatan[5] drops. (Id.).   The record reflects that
Plaintiff returned to Song Eye Center a few days later and it
was determined that his intraocular pressure (hereinafter "IOP")
was too high as it measured at 24 in his right eye and 26 in his
left eye. (Id. at 202).   Plaintiff's goal IOP levels are less
than 15 in both eyes. (Id. at 196).     Thus, Plaintiff was
scheduled for a visual field test. (Id. at 202).

---

[4] When the patient cannot read the largest line of print on
an acuity chart at the accustomed distance, he can be slowly
moved toward the chart until the largest letter can be read.
The numerator of the Snellen fraction becomes the shortened
distance (e.g., 10 feet) and the denominator refers to the
smallest letter read on the chart (i.e., the 20/400 "E").   If no
letters can be read at any distance, the examiner then asks the
patient to count fingers at progressively shorter distances
until this task can be reliably performed and the distance is
recorded (e.g., "counts fingers at 3 feet").   If finger counting
is not possible, one checks for the perception of hand motions,
then light perception with accurate localization, light
perception with localization, and finally, no light perception.
http://www.ncbi.nlm.nih.gov/books/NBK219/ (Last visited: August
28, 2013).

[5] Xalatan is the brand name for latanoprost ophthalmic,
which is used to treat glaucoma (a condition in which increased
pressure in the eye can lead to gradual loss of vision) and
ocular hypertension (a condition which causes increased pressure
in the eye).   Latanoprost is in a class of medications called
prostaglandin analogs.   It lowers pressure in the eye by
increasing the flow of natural eye fluids out of the eye.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697003.html.
(Last visited: August 28, 2013).

On September 2, 2005, the results of Plaintiff's visual field test revealed that he had a "general reduction of sensitivity" and his visual field was "outside normal limits." (Id. at 199-201). The test also revealed that Plaintiff's vision decreased to 20/40 in his right eye and 20/hand motion at face in his left eye.[6] Plaintiff was prescribed Cosopt[7] eye drops to take in conjunction with the Xalatan drops. (Id. at 198). By April 13, 2006, Dr. Mays reported that Plaintiff's IOP levels were "at goal" and measured at 14 in both eyes. At this point, his vision, with best correction, was 20/20 in his right eye and 20/hand motion at face in his left eye. (Id.). Also, in 2006, Plaintiff had bilateral laser surgery on both eyes.[8] (Tr. 35-36).

On November 20, 2008, Plaintiff returned to the Song Eye Center for a follow up visit. (Id. at 194). He reported that his right eye was blurry and requested a prescription for new

---

[6] See footnote 4 for details concerning hand motion measurement.

[7] Cosopt Pf is a carbonic anhydrase inhibitor with a beta-adrenergic receptor blocking agent indicated for the reduction of elevated intraocular pressure (IOP) in patients with open-angle glaucoma or ocular hypertension who are insufficiently responsive to beta-blockers.

http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=06c062ca-add7-4ddf-ba7c-7b5dd531e9ec. (Last visited: August 28, 2013).

[8] At the administrative hearing, Plaintiff reported that the laser surgery did not do any good. (Id. at 36).

glasses. (Id.).   The treatment notes reflect that Plaintiff's visual field was better than expected in his right eye and worse than expected in his left eye. (Id.).   They further reflect that Plaintiff was in poor compliance with his medications; thus, he was counseled about the severity of his illness and the importance of compliance with his prescribed medications. (Id.). On December 4, 2008, Plaintiff returned for an IOP check and was diagnosed with end stage glaucoma in his right eye.   He was instructed to continue taking his medications and to follow up with Dr. Mays, an ophthalmologist. (Id. at 192).

Plaintiff was seen by Dr. Mays on December 21, 2008. (Id. at 208).   Dr. Mays noted that Plaintiff had advanced glaucoma that was worse on the left than on the right. (Id.).   Dr. Mays also found that Plaintiff's IOP had improved to 13 on the right and 10 on the left, and was "once again under control".   The March 5, 2009 notes from Song Eye Clinic reflect that Plaintiff's IOP levels were 16 in the right eye and 14 in the left eye, which the doctor felt were "okay". (Id.).   On June 4, 2009, Plaintiff's IOP levels had improved to 15 in the right eye and 12 in the left eye and the doctor noted "IOP at goal". (Id. at 238).   During Plaintiff's September 3, 2009 visit, the doctor noted that Plaintiff's IOP levels were "too high" as his right eye was 18 and his left eye was 16. (Id.).   His medications were increased and he was instructed to return in three weeks. (Id.).

When Plaintiff returned on September 24, 2009, his IOP levels
had improved significantly to 12 in his right eye and 10 in his
left eye. (Id. at 237).  The treatment notes reflect "no
problems at this time" and that his IOP levels were "better".
(Id.).

Three months later, on December 24, 2009, Plaintiff
reported for his yearly exam. (Id. at 236).  The treatment notes
reflect that Plaintiff had no problems and that his IOP levels
were below the target of 15. (Id.).  When he returned on March
29, 2010, his IOP levels were still below target but his GXD was
worse; so, he was referred to Dr. Mays. (Id. at 235, 286).  On
June 15, 2010, Dr. Mays performed laser filtration surgery on
Plaintiff's right eye. (Id. at 286).  Dr. Mays found that
Plaintiff was again not taking his medications because he said
that he could not afford them, and as a result, his IOP was not
well-controlled. (Id. at 242).  After surgery, Dr. Mays noted
that Plaintiff "tolerated the procedure with no apparent
systemic complications." (Id.).  Dr. May's updated treatment
records reflect that post surgery, Plaintiff's visual acuity of
the right eye progressively improved from 20/count finger on the
day of the surgery to 20/25 in less than two months. (Id. at
289-91).

Plaintiff also sought medical treatment at Whaley Health
Services (hereinafter "Whaley") with Dr. Roy in connection with

his blood pressure.   On September 29, 2009, Plaintiff reported to the dentist for a tooth extraction and his blood pressure was noted to be 190/130; thus, his dentist referred him to Dr. Roy for clearance. (Id. at 257).   Dr. Roy proscribed Norvasc for blood pressure control and instructed Plaintiff to eat a low sodium and low fat diet and to begin exercising. (Id.). Plaintiff was also instructed to hold off on his dental work until his blood pressure was under control. (Id. at 258).   When Plaintiff returned to Dr. Roy for a follow up visit on October 6, 2009, his blood pressure was 180/110; so he was proscribed Lisinopril and instructed to continue taking the Norvasc. (Id. at 252-56).   By March 10, 2010, Plaintiff's blood pressure was down to 120/90, and he had lost twenty pounds. (Id. at 246). Dr. Roy' noted that Plaintiff's blood pressure was "well-controlled" and that he was cleared for dental work. (Id. at 244, 264).

On January 8, 2009, Dr. James Lewis, M.D., a state agency physician, reviewed Plaintiff' s medical records and completed a physical functional assessment. (Id. at 212-20).   He listed Plaintiff's diagnosis as primary open angle glaucoma, mainly in his left eye. (Id. at 212).   He noted that Plaintiff's vision measured at 20/20 in the right eye with a moderate restriction of the nasal portion and only count finger vision in the left eye. (Id. at 215).   He assigned Plaintiff an overall vision

rating of 03. (Id. at 212).  Dr. Lewis found that Plaintiff has no exertional limitations; however, he also found that Plaintiff should not work near unprotected heights, hazardous machinery, or in areas where there is frequent movement from place to place of machinery, equipment, or personnel. (Id. at 214-15).

He also opined that Plaintiff should never use a ladder, rope or scaffold and should avoid uneven terrain. (Id. at 215-16).  He found that Plaintiff is limited in near acuity, far acuity, depth perception, and field of vision but that he has no limitations with regard to accommodation and color vision. (Id. at 216).  Dr, Lewis further opined that Plaintiff should avoid work that requires good binocular vision or good depth perception. (Id.).  Dr. Lewis concluded that "[in] view of the good vision and only moderate restr[ictions] of the best eye, he should have no diff[iculty] with cooking, driving, and doing [household] chores." (Id.).

The record reflects that the Agency referred Plaintiff to Dr. Charles Robbins, M.D., for a consultative eye examination on March 30, 2010. (Id. at 222-26).  With regard to Plaintiff's visual acuity for distance, Dr. Robbins found that Plaintiff's right eye measures 20/200, without glasses, which can be corrected to 20/20, and that his left eye measures light perception and cannot be corrected. (Id. at 222).  With regard to Plaintiff's ability to engage in reading or close work, Dr.

Robbins found that Plaintiff's right eye is capable of J-1, without glasses, which can be correct to J-1+ and that he is unable to engage the left eye in close work or reading. (Id.). He further found that Plaintiff's visual field is restricted and that even with correction, his left eye is only light perception. Thus, he concluded that Plaintiff will not be able to achieve useful binocular vision in all directions and as a result, he is precluded from jobs requiring good binocular vision. (Id. at 222-23).

In addition, Dr. Robbins found that Plaintiff has no depth perception and that he has color perception in his right eye only. (Id. at 223). He also found that Plaintiff's IOP levels were 22 in the right eye and 21 in the left eye. (Id.). He noted that Plaintiff's fundus examination was abnormal due to advance stage nerve damage of his left eye. (Id.). Dr. Robbins diagnosed Plaintiff with glaucoma, which he described as stable or progressive in the right eye and permanent in the left eye. (Id.). He opined that improvement of Plaintiff's condition in the right eye "depends on treatment." (Id.). Dr. Robbins also opined that Plaintiff needed to decrease his IOP of his right eye in order to save his vision. He further opined that Plaintiff's prognosis was fair if he were to undergo filtration surgery of the right eye. (Id. at 223-24). As discussed *supra*, Dr. Mays subsequently performed the filtration surgery on

Plaintiff's right eye on June 15, 2008. (Id. at 286, 289-91).

### 2. **Issues**

**Whether the ALJ erred in finding that Plaintiff can perform the representative jobs outlined by the vocational expert (VE) because their descriptions in the Dictionary of Occupational Titles (DOT) are at odds with Plaintiff's residual functional capacity ("RFC")?**

Plaintiff maintains that while the VE identified three jobs that Plaintiff can perform, namely products assembler (DOT number 706.687-010), laundry worker (DOT number 302.685-010), and electronics accessories assembler (DOT number 729.687-010), the ALJ erred in relying on this testimony because all three jobs require frequent near acuity, and his RFC recognizes the fact that Plaintiff has limited near acuity, far acuity, depth perception, and field of vision. (Doc. 14 at 7-8). In response, the Commissioner contends that the jobs outlined by the VE are consistent with the ALJ's RFC assessment of Plaintiff's "limited" vision. (Doc. 15 at 13). The Commissioner further contends that "even if the depth perception requirement of the production assembler and electric assembler jobs preclude Plaintiff from performing them, the laundry work job requires frequent near acuity – which Plaintiff can do with his 20/20 right eye…"(Id. at 14).

As noted *supra*, at step five of the sequential evaluation process, the Commissioner has the burden of proving that the plaintiff is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985). An ALJ may make this determination by relying on the testimony of a VE. Leigh v. Commissioner of Social Security, 496 Fed. App'x 973 (llth Cir. 2012)(per curiam) (citing Jones v. Apel, 190 F.3d 1224, 1230 (llth Cir. 1999)). For a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the plaintiff's impairments. Id., 496 Fed. App'x 973, 190 F.3d at 1229. If there is a conflict between the DOT and the jobs identified by the VE, the VE trumps the DOT because the DOT is not the sole source of admissible information concerning jobs. Id.; Robinson v. Astrue, 2011 U.S. Dist. LEXIS 68974, (M.D. Ala. June 27, 2011) (citing Jones v. Apfel, *supra*); Social Security Ruling 00-4p, 2000 SSR LEXIS 8.

Social Security Ruling 00-4p provides that when a VE provides testimony about the requirements of a job or occupation, the ALJ has an affirmative responsibility to ask about any possible conflict between the VE's testimony and the DOT. 2000 SSR LEXIS 8; Leigh, *supra*. When the VE's testimony is

inconsistent with the DOT, the ALJ must revolve the conflict before relying on the VE's testimony. Id.

In Leigh, a panel of the Eleventh Circuit recognized the ALJ's duty to inquire on the record about any conflict between the VE's testimony and the DOT, and held that where the ALJ expressly questioned the VE about any conflict between his testimony and the DOT, and the plaintiff did not offer any evidence controverting the VE's testimony or otherwise object to the VE's opinion, the ALJ's decision was due to be affirmed.

In the instant action, the ALJ found that "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the [DOT]" (tr. 19); however, a searching review of the hearing transcript fails to reveal any question to the VE about possible inconsistencies between the VE's testimony and the DOT. Based upon the medical evidence in this case, the ALJ developed an RFC that provides limitations in near acuity, far acuity, depth perception, and field of vision, yet all three jobs identified by the VE and relied upon by the ALJ require frequent near acuity, and two of the three, products assembler and electronics accessories assembler, also require frequent or occasional depth perception. While the Eleventh Circuit has ruled that the VE's testimony trumps the DOT, there is nothing in the Jones, Robinson, or Leigh decisions that relieves the ALJ of his obligation to question the VE in

accordance with SS ruling 00-4p. Indeed, had the VE in this case been questioned regarding inconsistencies between his testimony about jobs that Plaintiff can perform and the DOT's description of those positions, it might well have led to a different outcome given the documented medical evidence regarding the functional limitations caused by Plaintiff's visual impairments and the seemingly inconsistent DOT descriptions. Accordingly, this case must be **REVERSED** and **REMANDED.**[9]

## V.   Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits is **REVERSED** and **REMANDED** to allow the Administrative Law Judge to obtain new vocational expert testimony regarding whether there is other work in the national economy that Plaintiff can perform, to find whether any conflicts exists between the opinion of the vocational expert and the Dictionary of Occupational Titles, and to resolve all

---

[9] Because this case is being reversed and remanded, the undersigned has not addressed the other issues raised in Plaintiff's brief.

conflicts on the record as required by SSR 00-49, 2000 SSR LEXIS 8.

       **ORDERED** this **30th** day of **September, 2013.**

<u>     **/s/ SONJA F. BIVINS**     </u>
**UNITED STATES MAGISTRATE JUDGE**
